# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| **SADIE MILLER** | ) | |
| | ) | |
| | ) | |
| **Plaintiff** | ) | **Civil Action No.:** 4:14-cv-652 |
| | ) | |
| **v.** | ) | **COMPLAINT AND** |
| | ) | **JURY DEMAND** |
| **BAYER HEALTHCARE** | ) | |
| **PHARMACEUTICALS INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff, Sadie Miller ("Plaintiff"), tenders the following as her Complaint and Jury Demand against Defendant, Bayer Healthcare Pharmaceuticals Inc. ("Bayer"), for personal injuries suffered as a proximate result of Plaintiff Sadie Miller ("Plaintiff") being prescribed and properly using the defective and unreasonably dangerous product Mirena® (levonorgestrel-releasing intrauterine system).

## PARTIES

1.    At all relevant times hereto, Plaintiff was a resident of Kansas City (Clay County), Missouri.

2.    Defendant Bayer is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 100 Bayer Boulevard, Whippany, New Jersey 07981.

3.    Defendant Bayer was formerly known as Berlex, Inc., which was formerly known as Berlex Laboratories, Inc.

4. Berlex Laboratories, Inc. and Berlex, Inc. were integrated into Bayer HealthCare AG and operated as an integrated specialty pharmaceuticals business under the new name, Bayer Healthcare Pharmaceuticals, Inc.

5. Defendant Bayer is the holder of the approved New Drug Application ("NDA") for the contraceptive device Mirena®.

6. Bayer is in the business of designing, manufacturing, marketing, formulating, testing, packaging, labeling, producing, creating, making, constructing, assembling, advertising, and distributing prescription drugs and women's healthcare products, including the intrauterine contraceptive system Mirena®.

7. Bayer does business in the State of Missouri through the sale of Mirena® and other prescription drugs in this state.

8. At all relevant times, Defendant Bayer was engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States, either directly or indirectly through third parties, subsidiaries or related entities, the contraceptive device Mirena®.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because Defendant is incorporated and has its principal place of business in states other than the state in which the named Plaintiff resides.

10. This Court has supplemental jurisdiction over the remaining common law and state law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in Clay County, Missouri.

**FACTS**

12.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

13.     Mirena® is an intrauterine system that is inserted by a healthcare practitioner during an office visit.  Mirena® is a t-shaped polyethylene frame with a steroid reservoir that releases 20 μg/day of levonorgestrel, a prescription medication used as a contraceptive.  Mirena® contains 52 mg of levonorgestrel.

14.     The federal Food and Drug Administration ("FDA") approved Defendant's New Drug Application for Mirena® in December 2000.

15.     In 2009, the FDA approved Mirena® for treatment of heavy menstrual bleeding in women who choose to use intrauterine contraception as their method of contraception.

16.     Today, more than 2 million women in the United States use Mirena®. Mirena® has been used by more than 15 million women worldwide.

17.     The Mirena® intrauterine system ("IUS") releases levonorgestrel, a synthetic progestogen, directly into the uterus for birth control.

18.     Defendant admits, "[i]t is not known exactly how Mirena works," but suggests that Mirena® may thicken cervical mucus, thin the uterine lining, inhibit sperm movement and reduce sperm survival to prevent pregnancy.

19. The IUS is designed to be placed within seven (7) days of the first day of menstruation and is approved to remain in the uterus for up to five (5) years. If continued use is desired after five years, the old IUS must be discarded and a new IUS inserted.

20. The IUS package labeling recommends that Mirena® be used in women who have had at least one child.[1]

21. The IUD package labeling recommends that Mirena® be placed at least six weeks post-partum.

22. The IUS package labeling indicates that Mirena® should be used *with caution* in patients who have: "Migraine, focal migraine with asymmetrical visual loss or other symptoms indicating transient cerebral ischemia."[2]

23. The package labeling indicates that removal of Mirena® *should be considered* if patients develop for the first time: "Migraine, focal migraines with asymmetrical visual loss or other symptoms indicating transient cerebral ischemia."[3]

24. Transient cerebral ischemia is similar to a stroke in that it is caused by disruption of cerebral blood flow. Like a stroke, this disruption is often caused by a blood clot blocking a blood vessel leading to the brain. It is often described as a "mini-stroke."

25. Upon information and belief, these indications are specifically designed to caution healthcare providers about a possible increased risk of transient cerebral ischemia or stroke with Mirena® use.

---

[1] *See* 08/07/2013 Mirena Label "Full Prescribing Information" , p. 2, available at: http://www.accessdata.fda.gov/drugsatfda_docs/label/2013/021225s032lbl.pdf.
[2] *See Id.*, p. 14.
[3] *See Id.*, p. 15.

26. Mirena®'s label does not sufficiently warn about non-stroke neurological conditions such as pseudotumor cerebri ("PTC"), also known as idiopathic intracranial hypertension ("IIH").

27. Mirena®'s label makes no mention of PTC/IIH, despite a known link between levonorgestrel and PTC/IIH.

28. Defendant also provides a "Patient Information Booklet" to physicians to be given to patients at the time of Mirena insertion.

29. Defendant's Mirena "Patient Information Booklet" also makes no mention of PTC/IIH, despite a known link between levonorgestrel and PTC/IIH.

30. Upon information and belief, Defendant did no clinical testing of Mirena® and its known link to the development of IIH/PTC, despite over a decade of literature indicating further testing between levonorgestrel and IIH/PTC is needed.

31. Pseudotumor cerebri or idiopathic intracranial hypertension is a condition that develops in the skull when a person's cerebrospinal fluid becomes elevated, causing increased pressure. Fluid builds up in the skull and is not released and absorbed at the proper rate. PTC derives its name from the fact that the condition acts like a tumor but it is not actually a tumor.

32. Patients with PTC or IIH typically develop symptoms of severe migraines or migraine-like headaches with blurred vision, diplopia (double vision), temporary blindness, blind spots, or other visual deficiencies. Visual problems and symptoms are a result of increased pressure on the optic nerve. Patients with PTC or IIH often develop papilledema, or optic disc swelling due to increased intracranial pressure.

33.     PTC or IIH patients may also develop a "whooshing" or ringing in the ear, clinically called tinnitus.

34.     PTC or IIH is frequently diagnosed after a lumbar puncture, or spinal tap, is performed which allows a physician to evaluate the level of cerebrospinal fluid in the skull.  When patients present with symptoms of PTC or IIH, they often first undergo an MRI, CT scan, and/or other diagnostic radiology tests to rule out an actual tumor or blood clot in the brain.

35.     A lumbar puncture is a diagnostic, and sometimes, therapeutic procedure by which a physician inserts a hollow needle into the subarachnoid space in the lumbar area, or lower back of a patient, and draws cerebrospinal fluid ("CSF") from the patient. The collected cerebrospinal fluid is tested to rule out infection or inflammation in the fluid that may be responsible for the elevated pressure.  In patients with PTC or IIH, the cerebrospinal fluid is normal.

36.     In some cases, a lumbar puncture may provide some immediate relief to a patient suffering from PTC or IIH, but it does not cure to the condition.  Conversely, a lumbar puncture may result in a post-lumbar puncture headache, bleeding or back pain.

37.     Normal intracranial pressure is considered between 5 and 15 millimeters of mercury (mmHg).  Pressure above the 15 mmHg range may lead to a diagnosis of PTC or IIH.

38.     Failure to correctly diagnose and treat PTC or IIH may lead to permanent vision loss and even blindness.

39. There is currently no treatment to reverse permanent injury to the optic nerves caused by increased intracranial pressure. Because of this, treatment of PTC or IIH is focused on halting visual loss that has already occurred.

40. Although PTC or IIH is considered reversible in some patients, it may take years before normal pressure is maintained. It also may be irreversible in some cases.

41. PTC or IIH may also recur throughout a patient's lifetime.

42. Treatment of PTC or IIH may include weight loss, frequent lumbar punctures, or medication. Frequently, the medicine Acetazolamide (Diamox®) is prescribed to patients suffering from PTC or IIH. Diamox® comes with its own set of adverse reactions.

43. Although experts suggest that even a 6% body weight loss in patients suffering from PTC/IIH can relieve the symptoms, many women suffering from this disorder while on Mirena® who lose 6% of their body weight or more experience no relief and their condition does not improve.

44. In severe cases, therapeutic shunting, which involves surgical insertion of a tube to help drain cerebrospinal fluid from the lower back or from the skull, is recommended.

45. A lumbar-peritoneal shunt ("LP shunt") is commonly used to treat severe cases of PTC/ IIH. An LP shunt involves inserting a tube between vertebrae in the lumbar region of the spine into the subarachnoid cavity.

46. A ventriculo-peritoneal shunt ("VP shunt") may also be used, which involves insertion of a tube through a patient's skull usually behind a patient's ear.

47.    Both types of shunting procedures work to relocate excess cerebrospinal fluid to the abdominal cavity, where it can be absorbed.

48.    Unfortunately, therapeutic shunting procedures have high failure and revision rates and often require several repeat or revision surgeries.  Additionally, a patient's shunt may need frequent adjustment, which may also require surgical intervention, to find the right setting for a particular patient's needs.

49.    Brain stent procedures, typically performed by interventional neuroradiologists are alternatives to shunting, and involve metal stents positioned to expand portions of cerebral veins that have become narrowed due to the increased pressure, in order to allow blood to drain more freely and relieve fluid pressure in the brain.

50.    It has been estimated that approximately 1-2 people per 100,000 in the United States have PTC or IIH, although reports suggest the prevalence of the disorder is increasing.  In 1994, a study found that in females between the ages of 15 to 44, IIH occurred at a rate of approximately 3.3 per 100,000 per year.[4]

51.    Despite the rarity of PTC/IIH, upon information and belief, women who use levonorgestrel-containing products, like the Mirena® IUS, more commonly develop the disorder.[5]

52.    Upon information and belief, the synthetic hormone released by Mirena®, levonorgestrel, causes or contributes to the development of PTC/IIH, increases the risk of developing PTC/IIH, and/or worsens or exacerbates PTC/IIH.

---

[4] *See* John B. Alder & F.T. Fraunfelder, *Letter to the Editor: Levonorgestrel Implants and Intracranial Hypertension*, 332 New Eng. J. Med. 1720, 1720-21 (1995), available at http://www.nejm.org/doi/full/10.1056/NEJM199506223322519.
[5] *See* fn. 1

53. Additionally, because Mirena® is known to cause rapid weight gain in women, the risk of developing PTC/IIH is even greater with Mirena® use.

54. In 1991, a levonorgestrel-releasing implant called Norplant® became available in the United States, after its manufacturer obtained FDA approval on December 10, 1990. Norplant® was developed by the Population Council and distributed in the United States by Wyeth-Ayerst Laboratories as the "Norplant System."

55. Norplant® consisted of a set of six small silicone capsules, each containing 36 mg of levonorgestrel, which were implanted subdermally in the upper arm and effective as contraception for five years. Norplant® was estimated to release levonorgestrel initially at about 85 μg/day followed by a decline to about 50 μg/day after nine months and to about 35 μg/day by 18 months with a further decline to about 30 μmg/day.

56. In February 1993, Wyeth submitted a supplemental new drug application to the FDA for the Norplant System, requesting the addition of "idiopathic intracranial hypertension" and other modifications to the PRECAUTIONS section of Norplant System's physician labeling. The supplemental NDA also requested other modifications to the physician labeling and the patient package insert. Wyeth requested expedited review of its supplemental NDA.

57. On March 26, 1993, the FDA approved the supplemental NDA, including its proposed addition of warnings regarding PTC/IIH to the Norplant System.

58. The new labeling addition included under the PRECAUTIONS section stated:
> "Idiopathic intracranial hypertension (pseudotumor cerebri, benign intracranial hypertension) is a disorder of unknown etiology which is seen most commonly in obese females of reproductive age. There have been reports of idiopathic intracranial hypertension in

NORPLANT SYSTEM users. A cardinal sign of idiopathic intracranial hypertension is papilledema; early symptoms may include headache (associated with a change in frequency, pattern, severity, or persistence; of particular importance are those headaches that are unremitting in nature) and visual disturbances. Patients with these symptoms should be screened for papilledema and, if present, the patient should be referred to a neurologist for further diagnosis and care. NORPLANT SYSTEM should be removed from patients experiencing this disorder."

59.     A warning for PTC/IIH was also added to the patient package insert and stated:

"Idiopathic intracranial hypertension (pseudotumor cerebri, benign intracranial hypertension) – An increase in intracranial pressure has been reported in NORPLANT SYSTEM users. Symptoms may include headache (associated with a change in the frequency, pattern, severity, or persistence, of particular importance are those headaches that do not stop) and visual disturbances. Contact your physician or health-care provider if you experience these symptoms. While a causal relationship is unclear, your health-care provider may recommend that the NORPLANT SYSTEM be removed."

60.     By 1995, several reports of women developing PTC or IIH were reported in The New England Journal of Medicine.[6] The authors noted that levonorgestrel may have contributed to the onset of the condition. The authors concluded that until more information became available, patients should be screened for symptoms and the implants should be removed in patients who show increased intracranial pressure.

61.     Additional studies concluded the same and noted that IIH/PTC had been reported in Norplant users.[7] By 2001, Norplant®'s label included an entry under the "Warnings" section for "Idiopathic Intracranial Hypertension" that stated:

---

[6] *See Id.*
[7] *See* Allan J. Coukell & Julia A. Balfour, *Levonorgestrel Subdermal Implants: A Review of Contraceptive Efficacy and Acceptability*, 55 Drugs 861, 877 (1998); Karen R. Meckstroth & Philip D. Darney, *Implantable Contraception*, 27 Obstet Gynecol Clin North Am 781, 796 (2000); and Wysowski DK, Green L., *Serious adverse events in Norplant users reported to the Food and Drug Administration's MedWatch Spontaneous Reporting System.*, 85 Obstet Gynecol. 538-42 (1995).

"Idiopathic intracranial hypertension (pseudotumor cerebri, benign intracranial hypertension) is a disorder of unknown etiology which is seen most commonly in obese females of reproductive age. There have been reports of idiopathic intracranial hypertension in NORPLANT (levonorgestrel implants (unavailable in us)) SYSTEM users. A cardinal sign of idiopathic intracranial hypertension is papilledema; early symptoms may include headache (associated with a change in frequency, pattern, severity, or persistence; of particular importance are those headaches that are unremitting in nature) and visual disturbances. Patients with these symptoms, particularly obese patients or those with recent weight gain, should be screened for papilledema and, if present, the patient should be referred to a neurologist for further diagnosis and care. NORPLANT (levonorgestrel implants (unavailable in us)) SYSTEM should be removed from patients experiencing this disorder."

62.     Jadelle® or "Norplant® II", which is a two-rod levonorgestrel-releasing implant, also contains similar language under the "Warnings" section of its label.[8]  And importantly, Jadelle® is contraindicated in patients with a history of IIH.

63.     Jadelle® was approved in the United States in 1996 for up to three years use and in 2002 for up to five years use.  However, Jadelle® has never been marketed in the United States.

64.     Both the Norplant® and Jadelle® labels included warnings of PTC/IIH specific to informing patients of the disorder.

65.     By the mid-1990s, tens of thousands of lawsuits were filed claiming injuries due to Norplant®.  In 1996, the FDA received a "Citizen's Petition before the Food and Drug Administration requesting withdrawal for sale of Norplant®."[9]  The petition claimed a number of adverse events were related to Norplant® use, including PTC/IIH.  Wyeth pulled Norplant® off the market in June of 2002.

---

[8]     *See* 11/22/2002 "Norplant II" Jadelle® Label, p. 10 available at http://www.accessdata.fda.gov/drugsatfda_docs/label/2002/20544se2-003_jadelle_lbl.pdf.
[9] *See* http://pop.org/content/norplant-background-a-pri-petition-888.

66. Despite a wide body of information available to Defendant regarding the connection between levonorgestrel and PTC/IIH, Mirena®'s label is devoid of any warning regarding PTC or IIH.

67. Upon information and belief, because Mirena®'s label is devoid of any warnings of PTC or IIH, once a patient's healthcare provider rules out transient cerebral ischemia or stroke as a cause of symptoms of migraine and/or asymmetrical visual loss, the healthcare provider will not typically know or advise a patient with PTC to remove Mirena®, which causes or contributes to the development and/or progression of PTC/IIH.

68. Defendant has a history of overstating the efficacy of Mirena® while understating the potential safety concerns.

69. In or around December 2009, Defendant was contacted by the Department of Health and Human Services' Division of Drug Marketing, Advertising, and Communications ("DDMAC") regarding a consumer-directed advertising program entitled "Mirena® Simple Style Statements Program," a live presentation designed for "busy moms." The Simply Style program was presented in a consumer's home or other private setting by a representative from "Mom Central," a social networking internet site, and Ms. Barb Dehn, a nurse practitioner, in partnership with Defendants.

70. The Simple Style program represented that Mirena® use would increase the level of intimacy, romance and emotional satisfaction between sexual partners. DDMAC determined these claims were unsubstantiated and, in fact, pointed out that Mirena®'s package insert states that at least 5% of clinical trial patients reported a decreased libido after use.

71.     The Simply Style program script also intimated that Mirena® use can help patients "look and feel great."  Again, DDMAC noted these claims were unsubstantiated and that Mirena® can caused a number of side effects, including weight gain, acne, and breast pain or tenderness.

72.     The portion of the Simple Style script regarding risks omitted information about serious conditions, including susceptibility to infections and the possibility of miscarriage if a woman becomes pregnant on Mirena®.

73.     Finally, Defendant falsely claimed that Defendant's product required no compliance with a monthly routine.

74.     Plaintiff Sadie Miller is currently 27 years old.

75.     Plaintiff had the Mirena® IUS inserted into her body without complication according to the manufacturer's instructions by a healthcare practitioner.

76.     Plaintiff received Defendant's "Patient Information Booklet" when her healthcare practitioner placed her Mirena®.

77.     Plaintiff and her healthcare practitioners relied on Defendant's representations regarding Mirena® in its package insert, Patient Information Booklet, or otherwise disseminated by Defendant in deciding to use and prescribe Mirena®.

78.     Plaintiff received, read and relied upon Defendant's "Patient Information Booklet," when deciding to use Mirena.

79.     After her Mirena® was placed, among other things, Plaintiff began experiencing head and neck pain, stiffness, dizziness, and vision problems, including temporary vision loss.

80. After seeking treatment from her physicians, Plaintiff's Mirena was removed and Plaintiff was diagnosed with papilledema and IIH/PTC.

81. Plaintiff has also suffered additional injuries related to her Mirena IUD.

82. Plaintiff's IIH/PTC was caused and/or triggered by her Mirena®, and/or her Mirena® contributed to Plaintiff's development of IIH/PTC.

83. As a result of the injuries she suffered as a result of the defective and unreasonably dangerous Mirena® IUS, she has been permanently injured and has incurred or will incur past and future medical expenses, has experienced or will experience past and future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

## COUNT I
## NEGLIGENCE

84. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

85. Defendant was and is engaged in the business of selling Mirena® in the State of Missouri.

86. The Mirena® was manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, distributed, and sold by Defendant was expected to, and did, reach Plaintiff without substantial change in the condition in which it was sold.

87. Defendant owed a duty to provide a reasonably safe product and to warn Plaintiff, patients, the FDA, prescribing physicians, the healthcare community, and other foreseeable users of the foreseeable risks associated with Mirena.

88.     Defendant owed a duty to design its Mirena in a way to prevent foreseeable harm to patients like the Plaintiff.

89.     Defendant owed a duty to test its Mirena in a manner that was commensurate with the dangers associated with it.

90.     The foreseeable risks associated with the design or formulation of Mirena® include, but are not limited to, the fact that the design or formulation of Mirena® is more dangerous than a reasonably prudent consumer would expect when used in an intended and reasonably foreseeable manner.

91.     The foreseeable risks associated with the design or formulation of Mirena® include, but are not limited to, the development of IIH/PTC, and rapid or sudden weight gain, which is also a risk factor in the development of IIH/PTC.

92.     The foreseeable risks associated with Defendant's Mirena design outweigh its utility for the foreseeable uses for which it is prescribed to patients like the Plaintiff.

93.     Defendant manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, distributed and sold a product that was not merchantable and/or reasonably suited to the use intended, and its condition when sold was the proximate cause of the injuries sustained by the Plaintiff.

94.     Defendant failed to adequately and properly test the Mirena both before and after placing it on the market.

95.     As a direct and proximate cause of Plaintiff's use of Mirena®, she has been permanently injured and has incurred or will incur past and future medical expenses,

has experienced or will experience past and future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

96.     Defendant placed Mirena® into the stream of commerce with wanton and reckless disregard for the public safety.

97.     Defendant knew or should have known that physicians and other healthcare providers began commonly prescribing this product as a safe and effective contraceptive device despite its lack of efficacy and potential for serious permanent side effects, including IIH/PTC.

98.     Defendant knew or should have known that Mirena®, and specifically, the synthetic progestin levonorgestrel, causes and/or contributes to the development of IIH/PTC, a severe and possibly irreversible brain condition.

99.     There are contraceptives on the market with safer alternative designs in that they provide equal or greater efficacy and far less risk.

100.    There are contraceptives on the market with safer alternative designs in that they do not expose patients to levonorgestrel, which is known to be associated with the development of IIH/PTC.

101.    Upon information and belief, Defendant failed to use reasonable care in designing Mirena® in that Defendant:

> a.     failed to properly and thoroughly test Mirena® before releasing the drug to market;
>
> b.     failed to properly and thoroughly analyze the data resulting from the premarketing tests of Mirena®;
>
> c.     failed to conduct sufficient post-marketing testing and surveillance of Mirena®;

d.  designed, manufactured, marketing, advertised, distributed, and sold Mirena® to consumers, including Plaintiff, without an adequate warning of the significant and dangerous risks of Mirena® and without proper instructions to avoid the harm which could foreseeably occur as a result of using the drug;

e.  failed to exercise due care when advertising and promoting Mirena®; and

f.  negligently continued to manufacture, market, advertise, and distribute Mirena® after Defendant knew or should have known of its adverse effects.

102.  A reasonable manufacturer would or should have known that the risks created by Mirena® were unreasonably greater than that of other contraceptives and that Mirena® had no clinical benefit over such other contraceptives that compensated in whole or part for the increased risk.

103.  Defendant knew or should have known that Mirena®, and specifically, the synthetic progestin levonorgestrel causes and/or contributes to the development of IIH/PTC, a severe and possibly irreversible brain condition that can also lead to permanent blindness.

104.  Despite an increasing number of adverse events, including reports of intracranial hypertension, blindness, papilledema, and increased intracranial pressure, Defendant has made no effort to warn physicians, the healthcare community, or patients of the risk of developing IIH/PTC with Mirena®.

105.  Defendant knew or should have known that an additional risk factor for developing IIH/PTC is sudden weight gain—a common side effect of Mirena—and Defendant did nothing to warn patients, physicians, or the healthcare community that Mirena® could cause rapid or sudden weight gain, which increases the risk of developing IIH/PTC.

106. Defendant, in fact, specifically recommends Mirena® for use in women of childbearing age and for use in women who have recently given birth, further misrepresenting Mirena®'s safety regarding its risk of developing IIH/PTC.

107. Likewise, Defendant knew or should have known that Mirena, a levonorgestrel-releasing IUD, should be removed immediately to avoid exacerbation of injuries, once a patient is diagnosed with papilledema, IIH/PTC, or once a patient develops symptoms consistent with these conditions, and Defendant has made no effort to warn patients, physicians, the healthcare community, or the public of this fact.

108. An ordinarily prudent manufacturer, with knowledge of Mirena's risks, including IIH/PTC, would not have placed Mirena on the market.

109. As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendant, Plaintiff has been permanently injured and has incurred or will incur past and future medical expenses, has experienced or will experience past and future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

110. Plaintiff demands judgment against Defendant for compensatory, statutory and punitive damages, together with interest, costs of suit, attorneys' fees and all other such relief as the Court deems appropriate pursuant to the common law and statutory law.

## COUNT II
## DESIGN DEFECT

111. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

112. Defendant was and is engaged in the business of selling Mirena® in the State of Missouri.

113. Defendant manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, distributed and sold, and otherwise released into the stream of commerce the pharmaceutical Mirena®, and in the course of same, directly advertised or marketed the product to consumers or persons responsible for consumers.

114. The Mirena® was manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, distributed, and sold by Defendant was expected to, and did, reach Plaintiff without substantial change in the condition in which it was sold.

115. Defendant's Mirena was unreasonably dangerous for the use for which it was intended, and its unreasonably dangerous condition existed when it left the control of Defendant.

116. Defendant's Mirena is defective and unreasonably dangerous because it releases and exposes patients long-term to levonorgestrel, which is known to cause, contribute to, and/or trigger the development of IIH/PTC.

117. Defendant's Mirena is defective because it failed to perform in a manner reasonably expected in light of its nature an intended function.

118. The foreseeable risks associated with the design or formulation of Mirena® include, but are not limited to, the fact that the design or formulation of Mirena® is more dangerous than a reasonably prudent consumer would expect when used in an intended and reasonably foreseeable manner.

119.    The foreseeable risks associated with the design or formulation of Mirena® include, but are not limited to, the development of IIH/PTC, and rapid or sudden weight gain, which is also a risk factor in the development of IIH/PTC.

120.    The foreseeable risks associated with Defendant's Mirena design outweigh its utility for the foreseeable uses for which it is prescribed to patients like the Plaintiff.

121.    The risks inherent in Mirena's design, including the risks of developing IIH/PTC, outweigh the utility of Mirena so designed.

122.    Defendant manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, distributed and sold a product that was not merchantable and/or reasonably suited to the use intended, and its condition when sold was the proximate cause of the injuries sustained by the Plaintiff.

123.    As a direct and proximate cause of Plaintiff's use of Mirena®, she has been permanently injured and has incurred or will incur past and future medical expenses, has experienced or will experience past and future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

124.    Defendant placed Mirena® into the stream of commerce with wanton and reckless disregard for the public safety.

125.    Defendant knew or should have known that physicians and other healthcare providers began commonly prescribing this product as a safe and effective contraceptive device despite its lack of efficacy and potential for serious permanent side effects, including IIH/PTC.

126. Defendant knew or should have known that Mirena®, and specifically, the synthetic progestin levonorgestrel, causes and/or contributes to the development of IIH/PTC, a severe and possibly irreversible brain condition.

127. There are contraceptives on the market with safer alternative designs in that they provide equal or greater efficacy and far less risk.

128. There are contraceptives on the market with safer alternative designs because they do not expose patients to levonorgestrel, which is known to cause, contribute to, and/or trigger the development of IIH/PTC.

129. These safer alternatives would have prevented or significantly reduced the risk of developing IIH/PTC, without substantially impairing their utility.

130. These safer alternatives were both technologically and economically feasible when Defendant's Mirena left the control of Defendant.

131. Defendant's Mirena is unreasonably dangerous in its design, in that the hormone released by Mirena causes, contributes to, and/or triggers the development of IIH/PTC.

132. As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendant, Plaintiff has been permanently injured and has incurred or will incur past and future medical expenses, has experienced or will experience past and future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

133. Plaintiff demands judgment against Defendant for compensatory, statutory and punitive damages, together with interest, costs of suit, attorneys' fees and all other such relief as the Court deems appropriate pursuant to the common law and statutory law.

## COUNT III
## FAILURE TO WARN

134. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

135. Defendant manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, distributed and sold, and otherwise released into the stream of commerce the pharmaceutical Mirena®, and in the course of same, directly advertised or marketed the product to consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of Mirena®.

136. Defendant knew or should have known that Mirena®, and specifically, the synthetic progestin levonorgestrel caused and/or contributed to the development of IIH/PTC, a severe and possibly irreversible brain condition.

137. Defendant failed to adequately warn that Mirena® causes and/or contributes to the development of IIH/PTC.

138. Defendant failed to warn the FDA, patients, physicians, the healthcare community, and the public at large of the risks associated with Mirena, including that use of Mirena causes, contributes to, and/or triggers the development of IIH/PTC.

139. Likewise, Defendant knew or should have known that Mirena, a levonorgestrel-releasing IUD, should be removed immediately to avoid exacerbation of injuries, once a patient is diagnosed with papilledema, IIH/PTC, or once a patient develops symptoms consistent with these conditions, and Defendant has made no effort to warn patients, physicians, the healthcare community, or the public of this fact.

140.    Despite an increasing number of adverse events, including reports of intracranial hypertension, blindness, papilledema, and increased intracranial pressure, Defendant has made no effort to warn physicians, the healthcare community, or patients of the risk of developing IIH/PTC with Mirena®.

141.    Defendant knew or should have known that an additional risk factor for developing IIH/PTC is sudden weight gain—a common side effect of Mirena®, and Defendant did nothing to warn patients, physicians, or the healthcare community that Mirena®'s could cause rapid or sudden weight gain, which increases the risk of developing IIH/PTC.

142.    Defendant knew or should have known that women of childbearing age, overweight women, and women with sudden weight gain, are at a higher risk of developing IIH/PTC, and yet Defendant failed to adequately warn that Mirena® causes and/or contributes to the development of the disorder, and that in combination with these other risk factors, Mirena® use presents even a greater risk of developing the disorder.

143.    Defendant also knew or should have known that Mirena® users who are diagnosed with papilledema and/or IIH/PTC, and/or who begin suffering from the symptoms of papilledema and/or IIH/PTC, should have their Mirena® removed immediately, and yet Defendant failed to warn or instruct of this fact.

144.    Mirena® is a defective and unreasonably dangerous product, because its labeling fails to adequately warn consumers and prescribers of, among other things, the increased risk of developing IIH/PTC.

145.    Mirena® was under the exclusive control of Defendant and was unaccompanied by appropriate warnings regarding all of the risks associated with its use.

The warnings did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer or physicians, including the increased risk of developing PTC/IIH.

146.     The promotional activities of Defendant further diluted or minimized the warnings given with the product.

147.     Defendant downplayed the serious and dangerous side effects of Mirena® to encourage sales of the product; consequently, Defendant placed its profits above its customers' safety.

148.     Mirena® was defective and unreasonably dangerous when it left the possession of Defendant in that it contained warnings insufficient to alert Plaintiff or her doctor to the dangerous risks and reactions associated with it.  Even though Defendant knew or should have known of the risks associated with Mirena®, it failed to provide warnings that accurately reflected the signs, symptoms, incident, scope, or severity of the risks associated with the product.

149.     Defendant, before or after approval of Mirena, withheld from or misrepresented to the FDA required information, including information regarding the link between PTC and levonorgestrel, that was material and relevant to the performance of the Mirena and was causally related to the Plaintiff's injuries.

150.     Plaintiff used Mirena® as intended and as indicated by the package labeling in a reasonably foreseeable manner.

151.     Plaintiff could not have discovered any defect in Mirena® through the exercise of reasonable care.

152. Defendant, as a manufacturer of pharmaceutical drugs, is held to the level of knowledge of an expert in the field and, further, Defendant had knowledge of the dangerous risks and side effects of Mirena®, including the risks of developing IIH/PTC.

153. Plaintiff did not have the same knowledge as Defendant and no adequate warning was communicated to her physician(s).

154. Plaintiff and her healthcare practitioners relied upon the Defendant's representations regarding Mirena® in the package insert or otherwise disseminated by the Defendant.

155. Defendant had a continuing duty to warn consumers, including Plaintiff and her physicians, and the medical community, of the dangers associated with Mirena®, and by negligently and/or wantonly failing to adequately warn of the dangers associated with its use, Defendant breached its duties.

156. Although Defendant knew, or was reckless in not knowing, of the defective nature of Mirena®, it continued to manufacture, design, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, distribute and sell Mirena® without providing adequate warnings and instructions concerning the use of Mirena® so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by Mirena®.

157. As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendant, Plaintiff has been permanently injured and has incurred or will incur past and future medical expenses, has experienced or will experience past and

future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

158.    Plaintiff demands judgment against Defendant for compensatory, statutory and punitive damages, together with interest, costs of suit, attorneys' fees and all other such relief as the Court deems appropriate pursuant to the common law and statutory law.

## COUNT IV
## STRICT LIABILITY

159.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

160.    Defendant is a manufacturer and/or supplier of Mirena® and is strictly liable to Plaintiff for manufacturing, designing, formulating, testing, packaging, labeling, producing, creating, making, constructing, assembling, marketing, advertising, distributing, selling, and placing Mirena® into the stream of commerce.

161.    Defendant is engaged in the business of manufacturing and selling the Mirena® IUS and placing it into the stream of commerce where it was expected to and did reach the Plaintiff.

162.    Defendant's Mirena® was expected to, and did, reach the Plaintiff without substantial change in the condition in which it was sold.

163.    Mirena®, manufactured and/or supplied by Defendant, was defective in design or formulation in that when it left the hands of the manufacturer and/or supplier, it was unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other contraceptives.

164. Mirena® was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with design or formulation.

165. Defendant's Mirena is defective because it failed to perform in a manner reasonably expected in light of its nature an intended function.

166. Defendant's Mirena was not merchantable and reasonably suited to the uses for which it is intended, including the uses for which it was prescribed to the Plaintiff, and its condition, when sold to the Plaintiff, proximately caused her injuries.

167. A reasonable alternative design existed which would have eliminated or reduced Plaintiff's injuries. Other methods of contraception do not pose the risks that Mirena® use presents, including the risk of developing IIH/PTC.

168. Mirena® was also defective due to inadequate warnings or instructions because the manufacturer knew or should have known that Mirena® created, among other things, a risk of developing IIH/PTC, and the Defendant failed to adequately warn of these risks.

169. Mirena® was also defective due to inadequate warnings or instructions because the manufacturer knew or should have known that Mirena®, along with its common side effect of rapid or sudden weight gain, created, among other things, a risk of developing IIH/PTC, and the Defendant failed to adequately warn of these risks.

170. Defendant owed Plaintiff a duty to warn of Mirena®'s dangers, including the increased risk of developing IIH/PTC, when used in its intended manner for contraception and/or to treat heavy menstrual bleeding.

171. Defendant breached its duty to warn Plaintiff of Mirena®'s dangers because Defendant's warnings were inadequate and Defendant failed to warn entirely of the risks of developing IIH/PTC with use of Defendant's Mirena®.

172. Defendant failed to adequately warn Plaintiff or her physicians of the increased risk of developing IIH/PTC with use of Mirena® and failed to warn that Mirena® should be immediately removed once Plaintiff is diagnosed with IIH/PTC, and/or papilledema, and/or suffers characteristics, symptoms, or manifestations of IIH/PTC and/or papilledema.

173. Mirena® was also defective due to inadequate pre-marketing testing.

174. Despite Defendant's knowledge of the risks associated with levonorgestrel-releasing implants, including the development of IIH/PTC, Defendant did not adequately conduct pre-market testing to account for the risks.

175. Defendant failed to provide adequate initial warnings and post-marketing warnings or instructions after the manufacturer and/or supplier knew or should have known of the extreme risks associated with Mirena®, and continues to promote Mirena® in the absence of those adequate warnings.

176. Despite Defendant's knowledge of an increasing number of adverse events reporting IIH/PTC or its symptoms, including papilledema, diplopia (double vision), severe migraine-like headaches, and blindness, Defendant did nothing to alert the healthcare community or patients or otherwise warn of these risks.

177. Defendant owed a post-sale duty to warn patients, including Plaintiff, of the dangers posed by its Mirena in light of an increasing number of adverse events of

IIH/PTC, papilledema, blindness, or other related symptoms, and Defendant failed in its duty to provide these post-sale warnings.

178.    Defendant continues to fail to warn of the risk of developing IIH/PTC with use of Mirena®.

179.    An ordinarily prudent manufacturer, with knowledge of Mirena's risks, including IIH/PTC, would not have placed Mirena on the market.

180.    Plaintiff and her healthcare providers relied upon Defendant's representations regarding Mirena® in the package insert or otherwise disseminated by Defendant, when deciding to prescribe and use Mirena®.

181.    Had Defendant properly warned of the risks associated with Mirena®, including the risk of developing IIH/PTC and that Mirena® should be removed immediately once a patient is diagnosed with or suffers symptoms of IIH/PTC, Plaintiff's healthcare providers would not have prescribed Mirena® to the Plaintiff, and Plaintiff would not have used Mirena®.

182.    Defendant's Mirena® is defective because it is unreasonably dangerous and does not meet the reasonable expectations of an ordinary consumer with respect to its safety; that is, Mirena® is an unreasonably dangerous product in a condition not contemplated by the ultimate consumer, including Plaintiff, and is not fit for its intended purpose.

183.    Plaintiff's Mirena® was defective, left the Defendant's control in a defective condition, was unaltered by Plaintiff or her physicians, and the defects are traceable to the Defendant.

184.    A reasonable manufacturer with knowledge of Mirena's dangerous condition would not have placed Mirena on the market.

185.    As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendant, Plaintiff has been permanently injured and has incurred or will incur past and future medical expenses, has experienced or will experience past and future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

186.    Plaintiff demands judgment against Defendant for compensatory, statutory and punitive damages, together with interest, costs of suit, attorneys' fees and all other such relief as the Court deems appropriate pursuant to the common law and statutory law.

## COUNT V
## BREACH OF IMPLIED WARRANTY

187.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

188.    Defendant manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, distributed and sold Mirena® as safe for use by the public at large, including Plaintiff, who purchased Mirena®.

189.    Defendant knew the use for which their product was intended and impliedly warranted the product to be of merchantable quality, safe and fit for use.

190.    Plaintiff relied on the skill and judgment of the Defendant, and as such, their implied warranty, in using Mirena®.

191.    Plaintiff used Defendant's Mirena® for the ordinary purposes for which it is indicated for use, and Plaintiff's physician inserted the Mirena® pursuant to the Defendant's instructions.

192.    Mirena® was defective and not of merchantable quality or safe or fit for its intended use because it is unreasonably dangerous and unfit for the ordinary purpose for which it is intended and was used.  Specifically, Mirena® is unreasonably dangerous, unmerchantable, and unfit for the ordinary purpose for which it is intended and was used because it causes and/or contributes to the development of IIH/PTC, a foreseeable risk, which Defendant knew or should have known of.

193.    Defendant's Mirena® does not meet the reasonable expectations of an ordinary consumer, including the Plaintiff, as to its safety and is not reasonably safe for its intended purpose and use because it is defectively designed and because Defendant inadequately warned of the risks of developing IIH/PTC and/or papilledema, and/or that the Mirena® should be removed once these conditions, and/or symptoms of these conditions, develop.

194.    Defendant had reason to know that Plaintiff would purchase Mirena® for the purpose of contraception and/or heavy menstrual bleeding.

195.    Defendant had reason to know that Plaintiff would rely on Defendant's skill or judgment to furnish and produce Mirena® in a safe and appropriate manner.

196.    As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendant, Plaintiff has been permanently injured and has incurred or will incur past and future medical expenses, has experienced or will experience past and

future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

197. Plaintiff demands judgment against Defendant for compensatory, statutory and punitive damages, together with interest, costs of suit, attorneys' fees and all other such relief as the Court deems appropriate pursuant to the common law and statutory law.

## COUNT VI
## BREACH OF EXPRESS WARRANTY

198. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

199. The aforementioned designing, manufacturing, marketing, formulating, testing, packaging, labeling, producing, creating, making, constructing, assembling, advertising, and distributing of Mirena® were expressly warranted to be safe by Defendant for Plaintiff and members of the public generally. At the time of the making of these express warranties, Defendant had knowledge of the foreseeable purposes for which Mirena® was to be used and Defendant warranted Mirena® to be in all respects safe, effective and proper for such purposes.

200. Defendant expressly warranted its Mirena in its label, which was directly intended to benefit Plaintiff.

201. Defendant's express warranties in its Mirena label were intended for the product's consumers, including the Plaintiff.

202. Defendant expressly warranted its Mirena in its Patient Information Booklet, which was intended to benefit Plaintiff and intended to be provided directly to Plaintiff.

203. Defendant expressly represented to Plaintiff, her physician(s), healthcare providers, and/or the FDA that Mirena was safe and fit for the uses in which it is intended.

204. Further, Defendant's promotional and marketing activities, including television commercials, pamphlets, and brochures stated or implied that Mirena is safe and fit for its intended uses, that it did not produce severe side effects, including IIH/PTC, and that it was adequately tested.

205. Plaintiff read and relied upon Defendant's express warranties in its Patient Information Booklet.

206. Plaintiff's physician(s) read and relied upon Defendant's express warranties in the Mirena label.

207. Mirena® does not conform to these express warranties and representations because Mirena® is not safe or effective and may produce serious side effects, including the development of IIH/PTC, and rapid and sudden weight gain, which also contributes to the risk of developing IIH/PTC.

208. As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendant, Plaintiff has been permanently injured and has incurred or will incur past and future medical expenses, has experienced or will experience past and future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

209. Plaintiff demands judgment against Defendant for compensatory, statutory and punitive damages, together with interest, costs of suit, attorneys' fees and all other such relief as the Court deems appropriate pursuant to the common law and statutory law.

33

## COUNT VII
## NEGLIGENT MISREPRESENTATION

210.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

211.    Defendant, having undertaken the designing, manufacturing, marketing, formulating, testing, packaging, labeling, producing, creating, making, constructing, assembling, advertising, and distributing of Mirena®, owed a duty to provide accurate and complete information regarding Mirena®.

212.    Defendant falsely represented to Plaintiff and Plaintiff's healthcare providers that Mirena® was a safe and effective contraceptive option and/or treatment for heavy menstrual bleeding.  The representations by Defendant were in fact false, as Mirena® is not safe and is dangerous to the health of its users.

213.    At the time the aforesaid representations were made, Defendant concealed from Plaintiff and her healthcare providers information about the propensity of Mirena® to cause great harm, including the increased risk of developing IIH/PTC, and the increased risk of suffering severe consequences due to not removing Mirena® once a patient experiences symptoms of papilledema and/or IIH/PTC.  Defendant negligently misrepresented claims regarding the safety and efficacy of Mirena® despite the lack of information regarding same.

214.    These misrepresentations were made by Defendant with the intent to induce Plaintiff to use Mirena® and to induce Plaintiff's healthcare providers to prescribe Mirena®, which Plaintiff and her healthcare providers were induced and did act, and which caused injury.

215. At the time of Defendant's misrepresentations and omissions, Plaintiff was unaware of the falsity of these statements and reasonably believed them to be true.

216. Defendant breached its duties to Plaintiff by providing false, incomplete and/or misleading information regarding its product.

217. Plaintiff and her healthcare providers reasonably believed Defendant's representations and reasonably relied on the accuracy of those representations when using and prescribing Mirena®.

218. As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendant, Plaintiff has been permanently injured and has incurred or will incur past and future medical expenses, has experienced or will experience past and future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

219. Plaintiff demands judgment against Defendant for compensatory, statutory and punitive damages, together with interest, costs of suit, attorneys' fees and all other such relief as the Court deems appropriate pursuant to the common law and statutory law.

## COUNT VIII
## FRAUDULENT MISREPRESENTATION

220. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

221. Defendant, having undertaken the designing, manufacturing, marketing, formulating, testing, packaging, labeling, producing, creating, making, constructing, assembling, advertising, and distributing of Mirena® described herein, owed a duty to provide accurate and complete information regarding Mirena®.

222.    Defendant fraudulently misrepresented material facts and information regarding Mirena® including, but not limited to, its propensity to cause serious physical harm, including its propensity to cause and/or contribute to the development of IIH/PTC, that it should be removed immediately upon diagnosis with papilledema and/or IIH/PTC, or any of the symptoms thereof, and that it leads to other risk factors for developing the disorder, including sudden and increased weight gain.

223.    Defendant fraudulently misrepresented that Mirena® was safe for use in women of child-bearing age, in women who have recently had a child, and in women without regard to their weight or body mass index, despite having actual knowledge that Mirena® is unreasonably dangerous and defective because its use creates an increased risk of developing IIH/PTC.

224.    Defendant fraudulently misrepresented that Mirena® caused few, if any, adverse reactions and side effects, and fraudulently misrepresented that Mirena® would not lead to neurologic side effects, including the development of IIH/PTC.

225.    Defendant made these misrepresentations to the FDA, the public, patients, physicians, and the healthcare community at large, throughout Defendant's pre- and post-marketing period and continuing to the present.

226.    Defendant made these misrepresentations to Plaintiff and her healthcare providers, with the intent to induce Plaintiff and her healthcare providers to use and prescribe Mirena, and with the intent to defraud Plaintiff and her healthcare providers.

227.    Defendant made these misrepresentations when initially obtaining FDA approval, when obtaining a new indication for heavy menstrual bleeding, during Mirena's entire post-marketing period, and continuing to the present.

228.    Defendant made these misrepresentations in advertisements, marketing, commercials, promotional materials, reports, press releases, campaigns, billboards, and instructional material and labeling.

229.    Defendant also made these misrepresentations in its "Patient Information Booklet" provided to Plaintiff and other Mirena patients at the time of insertion.

230.    Defendant intended to defraud the FDA, prescribing physicians, patients, the public, and Plaintiff and Plaintiff's physicians in making these misrepresentations.

231.    At the time of Defendant's fraudulent misrepresentations and omissions, Plaintiff was unaware and ignorant of the falsity of the statements and reasonably believed them to be true.

232.    Defendant knew this information to be false, incomplete and misleading and/or made fraudulent misrepresentations recklessly and without regard to its truth or falsity.

233.    Defendant intended to deceive and mislead Plaintiff and her healthcare practitioners so that they might rely on these fraudulent misrepresentations.

234.    Plaintiff and her healthcare practitioners had a right to rely on and did reasonably rely upon Defendant's deceptive, inaccurate and fraudulent misrepresentations.

235.    Plaintiff and her healthcare practitioners were deceived by Defendant's fraudulent misrepresentations.

236.    As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendant, Plaintiff has been permanently injured and has incurred or will incur past and future medical expenses, has experienced or will experience past and

future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

237.     Plaintiff demands judgment against Defendant for compensatory, statutory and punitive damages, together with interest, costs of suit, attorneys' fees and all other such relief as the Court deems appropriate pursuant to the common law and statutory law.

## COUNT IX
## FRAUD BY SUPPRESSION AND CONCEALMENT

238.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

239.     Defendant had a duty and obligation to disclose to Plaintiff and Plaintiff's healthcare providers that Mirena® was dangerous and likely to cause serious health consequences to users when used as prescribed.

240.     Defendant had a duty to disclose to Plaintiff and Plaintiff's healthcare providers that Mirena® causes and/or contributes to the development of IIH/PTC, and that it can also cause rapid or sudden weight gain, which also contributes to the development of IIH/PTC.

241.     Defendant had a duty to disclose to Plaintiff and Plaintiff's healthcare providers that Mirena® is particularly unsafe for use in overweight women of childbearing age, or in women who experience sudden weight gain, who are already at an increased risk of developing IIH/PTC.

242.     Defendant had a duty to disclose to Plaintiff and Plaintiff's healthcare providers that Mirena® should be removed immediately if a patient using Mirena® is diagnosed with IIH/PTC and/or papilledema, and/or develops any of the symptoms, characteristics, or manifestations of either IIH/PTC or papilledema.

38

243. Defendant intentionally, willfully, and maliciously concealed and/or suppressed the facts set forth above from Plaintiff and Plaintiff's healthcare providers with the intent to defraud her as alleged herein.

244. Neither Plaintiff nor her physicians were aware of the facts set forth above, and had they been aware of said facts would not have prescribed this product.

245. Defendants fraudulent suppression of the above facts induced Plaintiff to use Mirena® and induced Plaintiff's healthcare providers to prescribe the Plaintiff Mirena®.

246. Defendant fraudulently concealed this information from the FDA, the public, patients, physicians, and the healthcare community at large, throughout Defendant's pre- and post- marketing period and continuing to the present.

247. Defendant fraudulently concealed this information when initially obtaining FDA approval, when obtaining a new indication for heavy menstrual bleeding, during Mirena's entire post-marketing period, and continuing to the present.

248. Defendant fraudulently concealed this information in advertisements, marketing, commercials, promotional materials, reports, press releases, campaigns, billboards, and instructional material and labeling.

249. Defendant also fraudulently concealed this information in its "Patient Information Booklet" provided to Plaintiff and other Mirena patients at the time of insertion.

250. Defendant intended to defraud the FDA, prescribing physicians, patients, the public, and Plaintiff and Plaintiff's physicians by fraudulently concealing this information.

251.     As a proximate result of the concealment and/or suppression of the facts set forth above, Plaintiff has proximately sustained damage, as set forth herein.

252.     As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendant, Plaintiff has been permanently injured and has incurred or will incur past and future medical expenses, has experienced or will experience past and future pain and suffering, has incurred or will incur lost wages, and is subject to an increased risk of future harm.

253.     Plaintiff demands judgment against Defendant for compensatory, statutory and punitive damages, together with interest, costs of suit, attorneys' fees and all other such relief as the Court deems appropriate pursuant to the common law and statutory law.

## REQUEST FOR PUNITIVE DAMAGES

254.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

255.     At all times relevant herein, Defendant:

a.      knew that Mirena® was dangerous and ineffective;

b.      concealed the dangers and health risks from Plaintiff, physicians, pharmacists, other medical providers, the FDA and the public at large;

c.      made misrepresentations to Plaintiff, her physicians, pharmacists, hospitals and medical providers and the public in general as previously stated herein as to the safety and efficacy of Mirena®; and

d.      with full knowledge of the health risks associated with Mirena® and without adequate warnings of the same, manufactured, designed, formulated, testing, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, distributed and sold Mirena® for routine use.

256.     Defendant, by and through officers, directors, managing agents, authorized sales representatives, employees and/or other agents who engaged in malicious,

fraudulent and oppressive conduct toward Plaintiff and the public, acted with willful and wanton and/or conscious and/or reckless disregard for the safety of Plaintiff and the general public.

257. Defendant consciously and deliberately engaged in wanton disregard of the rights and safety of the Plaintiff.

258. Defendant had actual knowledge of Mirena®'s defective nature and capacity to cause injury because of its increased risk of developing IIH/PTC and Defendant failed to, and continues to fail to take any action to correct the problem.

259. Plaintiff's injuries are a result of fraud, malice, and/or gross negligence on the part of the Defendant.

260. As a direct and proximate result of one or more of these wrongful acts or omissions of the Defendant, Plaintiff is entitled to a recovery of punitive damages.

**WHEREFORE,** Plaintiff demands judgment against the Defendant and requests:

a)    A trial by jury;

b)    Judgment against Defendant for all compensatory and punitive damages allowable to Plaintiff;

c)    Judgment against Defendant for all other relief sought by Plaintiff under this Complaint;

d)    An order for all costs and attorneys' fees; and

e)    Such further relief which the Court deems just and appropriate.

Respectfully submitted,

**GORI, JULIAN & ASSOC.**

/s/ *D. Todd Mathews*
D. Todd Mathews  #52502
156 N. Main St.
Edwardsville, Illinois 62025
T: (618) 659-9833
F: (618) 659-9834
todd@gorijulianlaw.com

Counsel for Plaintiff